UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| TIFFANY MARIE KIMES, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | CAUSE NO.: 2:14-CV-239-TLS |
| CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration, | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

The Plaintiff, Tiffany Marie Kimes, seeks review of the final decision of the Commissioner of the Social Security Administration denying her applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). The Plaintiff filed applications for SSI and DIB on December 16, 2010, and April 29, 2011, respectively, alleging an onset date of November 11, 1983, her date of birth.

An ALJ held a hearing on January 22, 2013, at which the Plaintiff, who was represented by an attorney; the Plaintiff's mother, Deborah Kimes; and a vocational expert all testified. On February 21, 2013, the ALJ found that the Plaintiff was not disabled. The Plaintiff requested review of the ALJ decision, and on May 16, 2014, the Appeals Council denied the Plaintiff's request for review. On July 11, 2014, the Plaintiff initiated this civil action for judicial review of the Commissioner's final decision. For the following reasons, the ALJ's decision is reversed and remanded for proceedings consistent with this Opinion and Order.

## BACKGROUND

**A.      Plaintiff's Testimony**

At the ALJ hearing, the Plaintiff, who is now 32 years old, testified that she lives with her two sons (ages five and one) and two pets (one cat and one dog) in a mobile home. The Plaintiff does not have a high school diploma or GED;[1] and her past relevant work is as a fast food worker and a laundry worker. She was last employed in 2007.

The Plaintiff was born with agenesis of the corpus callosum, a rare birth defect in which the structure that connects the two hemispheres of the brain (the corpus callosum) is partially or completely absent. National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/agenesis/agenesis.htm (last visited March 31, 2016) (noting that "[t]he effects of the disorder range from subtle or mild to severe, depending on associated brain abnormalities"). According to the Plaintiff, her agenesis causes significant cognitive symptoms:

> It's hard for me to pay attention to things for very long . . . I have a problem with . . . following what I'm supposed to be doing because I'll forget, and somebody will tell me a simple task; you know, do something. I'll go to do it and my mind wanders so bad that I'll forget and I'll have to come back and ask.

(R. 60.) Her mother, Deborah Kimes, offered similar testimony:

> [The Plaintiff] has a lot of difficulty understanding things. Things have to be kept real simple for her. She has a lot of difficulty following directions. She's called me at work . . . and she'll be telling me something that a box tells her to do and how can she figure out how to make whatever that thing is on the box, and I know there's been times where she's been so frustrated she's thrown it out, because even with me telling her over the phone . . . she couldn't figure out how to do it.

---

[1] After completing the ninth grade, the Plaintiff assaulted a classmate with a cigar cutter and was transferred to a school for juvenile delinquents. She later dropped out and made a failed attempt at home schooling.

(R. 88.) She added that the Plaintiff has poor socialization skills, and has difficulty controlling her emotions and trusting people. *See* R. 91 ("[W]hen things don't go right she gets upset easily . . . it'll be yelling, screaming because something simple went wrong.")[2]

As to her non-agenesis related physical symptoms, the Plaintiff testified that, as a result of blood clots during her last pregnancy, she has difficulty using the right side of her body. In particular, she stated that she suffers from "pulsating pain" in her right leg and right arm, for which she takes hydrocodone, a pain medication. (R. 60.) The Plaintiff said she is unable to lift a gallon of milk using the right side of her body; to walk more than short distances without taking a break; stand for more than seven or eight minutes; or sit for more than 15 minutes. She also stated that she has difficulty using her right hand. *See* R. 65, 83 ("[Counsel:] Can you generally use your hands to grip, feel, and manipulate things? [Plaintiff:] With my left hand, yes; my right hand seems to drop things" due to tingling and numbness).

The Plaintiff testified that at home, she is able to cook simple meals (e.g., canned soup and microwave dinners), wash the dishes, straighten up around the house, and help care for her pets. Because the Plaintiff does not have a driver's license—she testified that she failed her driver's test six times—she relies on her mother for transportation. Her mother, who comes to her house at least three days per week, assists the Plaintiff with,

---

[2]The Plaintiff also testified that her agenesis causes physical symptoms; namely, the partial synchronization of her hands:

> When I go to, like, raise my hand my other hand will go halfway, or if I go to put my seatbelt on, the person in the driver's seat, I'll be twitching and getting numb. Or when I go to cook on the stove my hands copy each other. They do the same thing.

(R. 73.); *see also* R. 237, Third Party Function Report, Deborah Kimes, Sept. 6, 2011.

among other things, laundry, bill payments, and child care. The Plaintiff said she also relies on her 12-year-old daughter—who visits on weekends—and 5-year-old son for assistance with household chores. The Plaintiff testified that, on days when her mother is not at the house, they will communicate at least three or four times by phone. *See* R. 81 (testifying that she talks with her mother "[t]o make sure [she is] doing something right, or to make sure things are okay."). She added that her mother must also remind her to maintain her personal hygiene. *See also* R. 218, Third Party Function Report, Deborah Kimes, Jul. 3, 2011 (stating that the Plaintiff "has poor personal hygiene—needs reminders.")

The Plaintiff also described her employment history. From January 2005 to May 2005, the Plaintiff worked full-time at a care and rehabilitation center as a laundry worker (i.e., washing sheets, towels, and pillow cases). According to the Plaintiff, she was terminated because she "wasn't keeping up" with production quotas. *See* R. 75–76 (testifying that she had difficulty with her hands and remembering how to operate the laundry machines). Then, from June 2005 to November 2006, the Plaintiff worked part-time at Arby's, where she took orders from customers at the drive-through. The Plaintiff said she was placed on the night shift "so [she] wouldn't have to do as much activity" (R. 75), and that, throughout her shift, the manager assisted her with the operation of the cash register. The Plaintiff said she was eventually terminated because "[t]here was a change in management and [the new manager] wouldn't help." (*Id.*) Finally, the Plaintiff worked at McDonalds for approximately two months in 2007. The Plaintiff testified that she was terminated because she "couldn't keep up." (R. 52.)

4

**B.     Vocational Expert's Testimony**

At the hearing, the ALJ posed the following hypothetical to the vocational expert (VE):

> [A]ssume a hypothetical claimant of the same age, education, and work experience as the [Plaintiff] who has no exertional or postural limitations. However, the individual would be able to understand, remember, and carry out short, simple, repetitive instructions, would be able to sustain attention and concentration for two hours [sic] periods at a time and for eight hours in the work day on short, simple, repetitive instructions; could use judgment in making work decisions related to short, simple, repetitive instructions; would require an occupation with only occasional co-worker contact and supervision; would require an occupation with set routine and procedures and few changes during the work day; would require an occupation with superficial contact with the public on routine matters. This individual could not do anything [sic] fast paced production work, but could maintain regular attendance and be punctual within customary tolerances and could perform activities within a schedule. [Are any jobs available for the Plaintiff?]

(R. 97–98.) The VE responded that the Plaintiff could perform her previous work as a laundry worker, and that work is available as a hand packager, table worker, and assembler. The ALJ then asked whether, under the same hypothetical, any jobs are available if the Plaintiff only has frequent use of the left upper extremity, to which the VE responded that she could perform her previous work as a laundry worker, and that work is available as a table worker, an assembler of electrical equipment, and a key cutter. (R. 100.) Finally, the ALJ asked whether, under the first hypothetical, any jobs are available if the Plaintiff could not maintain regular attendance and be punctual within customary tolerances, and could not perform activities within a schedule or be on task more than 80 percent. The VE stated that an individual who is off task more than 15 percent cannot maintain employment. In response to a question from the Plaintiff's attorney, the VE also stated that, under the first hypothetical, an individual cannot maintain employment if he or she (1) is incapable of engaging in jobs that require occasional bilateral manual dexterity, due to neurological deficits; or (2) reacts "inappropriately" or "angrily" toward a supervisor after

5

receiving constructive criticism. (R. 104.)

**C.	ALJ Decision (Five-Step Evaluation)**

The Social Security regulations set forth a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v); 42 U.S.C. § 423(d)(1)(A) (defining a disability under the Social Security Act as being unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."); § 423(d)(2)(A) (an applicant must show that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.") The first step is to determine whether the claimant is presently engaged in substantial gainful activity (SGA). Here, the ALJ found that the Plaintiff was not engaged in SGA, so he moved on to the second step, which is to determine whether the claimant had a "severe" impairment or combination of impairments. An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). The ALJ determined that the Plaintiff has the following severe impairments: agenesis of the corpus callosum and an intermittent explosive disorder.

At step three, the ALJ concluded that the Plaintiff did not have an impairment, or combination of impairments that meets or medically equals the severity of one of the impairments listed by the Administration as being so severe that it presumptively precludes

SGA. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Because the Plaintiff's impairment was found not to meet or equal a listed impairment, the ALJ was required, at step four, to determine the Plaintiff's residual functional capacity (RFC). RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of his impairments. SSR 96–8p. The relevant mental work activities include understanding, remembering, and carrying out instructions; responding appropriately to supervision and co-workers; and handling work pressures in a work setting. 20 C.F.R. § 404.1545(c). The ALJ concluded that the Plaintiff had the RFC to perform a full range of work at all exertional levels. However, the ALJ found that the Plaintiff could only perform work that (1) only requires occasional co-worker contact and supervision; (2) has a set routine and procedures, with few changes during the workday; and (3) requires only superficial contact with the public on routine matters. The ALJ also found that the Plaintiff cannot perform fast-paced production work.

At the final step of the evaluation, the ALJ determined that, in light of the Plaintiff's age, education, work experience, and RFC, there are jobs that existed in significant numbers in the national economy that she could perform.

**STANDARD OF REVIEW**

The decision of the ALJ is the final decision of the Commissioner when the Appeals Council denies a request for review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). A court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In this substantial-evidence determination, the court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an inadequate discussion of the issues. *Id.*

The ALJ is not required to address every piece of evidence or testimony presented, but the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). If the Commissioner commits an error of law, remand is warranted without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## ANALYSIS

On appeal, the Plaintiff contends that the ALJ committed reversible error, in large part,

by (1) overstating the significance of her daily activities; (2) failing to provide sufficient reasons for discrediting the opinion of Dr. Joseph Fink, a neuropsychologist who determined that the Plaintiff suffers from significant neurological impairments; and (3) failing to account for her handling and fingering manipulative limitations in the RFC. After a critical review of the evidence, the Court finds that remand is warranted pursuant to sentence four of 42 U.S.C. § 405(g). *See Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 978 (7th Cir. 1999) ("[A] sentence-four remand . . . depends on a finding of error in the Commissioner's decision.").

**A.     Daily Activities**

First, the Court takes issue with the ALJ's analysis related to the Plaintiff's daily activities. In particular, throughout the ALJ's decision, emphasis is placed on the Plaintiff's "high level of adaptive functioning." (R. 28); *see* R. 25:

> The record indicates that [the Plaintiff] receives assistance from her mother and that she needs reminders to care for her personal grooming. Yet, she is a single parent and primary caregiver for her two sons, ages 5 and 1. Her 12 year old daughter also stays with her many weekends. She is able to live alone with her 2 sons, and manage herself, care for her children, and manage the home. She can perform household chores, such as cleaning, cooking and shopping, and care for her pets.

*see also* R. 28 (noting the Plaintiff's "ability for self-management, proper care of her young family, and home management").

Although it is proper for an ALJ to consider a claimant's daily activities when making a disability determination, SSR 96-7p, the Seventh Circuit has "cautioned that a person's ability to perform daily activities, especially if th[ey] can be done only with

9

significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013); *see also Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014) ("[W]e have urged caution in equating [daily] activities with the challenges of daily employment in a competitive environment, especially when the claimant is caring for a family member.") (citing *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office."), *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) ("minimal daily activities" such as preparing simple meals, weekly grocery shopping, taking care of family member, and playing cards "do not establish that a person is capable of engaging in substantial physical activity"), and SSR 96–7p (claimants may sometimes have structured daily activities to minimize symptoms and avoid physical and mental stressors)); *Wright v. Sullivan*, 900 F.2d 675, 682 (3d Cir. 1990) ("sporadic or transitory activity does not disprove disability") (internal quotation marks and citation omitted); *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989) (to be found unable to engage in substantial gainful activity the claimant need not "vegetate in a dark room" or be a "total basket case") (internal quotation marks and citation omitted).

Here, the distinction between "daily employment in a competitive environment," *Beardsley*, 758 F.3d at 838, and the structured daily activities of the home are highlighted throughout the Plaintiff's testimony. *See, e.g.*, R. 77 ("[Counsel:] If you try and do something at home—like you talked about trying to wash dishes, for example—do you have difficulty finishing things like that? [Plaintiff:] Yes . . . I'll do a few dishes and then

10

just stop, and then go do something else, and then I'll try to finish dishes later."); R. 81 (testifying that she communicates with her mother three to four times per day "[t]o make sure I'm doing something right, or to make sure things are okay.")

Moreover, by describing the Plaintiff's daily activities in general terms, the ALJ appears to understate the Plaintiff's limitations—and in particular, the Plaintiff's apparent dependence on her mother (and even her children) for home management. As noted above, the Plaintiff's mother comes to her home at least three days per week; performs a variety of household chores, including laundry, bill paying, and child and pet care; provides transportation for the Plaintiff (who does not have a license) and her children; and assists the Plaintiff with other relatively basic tasks on a daily basis. *See, e.g.*, R. 80, Pl's. Test. (testifying that she is unable to shop for appropriate grocery items without her mother's assistance). As to cooking, the Plaintiff testified that she only prepares simple meals (e.g., canned soup and microwave dinners); and as to cleaning, she testified that she cannot vacuum, dust, sweep, or do laundry, and that her 12-year-old daughter and 5-year-old son provide necessary assistance.[3]

---

[3] While the Court presumes that the ALJ's description of the Plaintiff's daily activities and/or capabilities is shaped by the ALJ's adverse credibility determinations, *see* R. 33, the discussion provided is inadequate as to how the ALJ bridged the gulf between the testimony of the Plaintiff and her mother, Deborah Kimes, and the ALJ's suggestion that the Plaintiff manages the home with fairly minimal assistance. The necessity for additional discussion is particularly pronounced in this case, where the ALJ consistently relied on the Plaintiff's daily activities to support his decision. *See* R. 25 (citing the Plaintiff's ability to "manage herself, care for her children, and manage the home" when determining that the Plaintiff does not have an impairment, or combination of impairments that meets or medically equals the severity of one of the impairments listed by the Administration as being so severe that it presumptively precludes SGA ); R. 28 (citing the Plaintiff's "ability for self-management, proper care of her young family, and home management supports [the Plaintiff's] high level of adaptive functioning" when determining the Plaintiff's RFC).

Accordingly, on remand, the ALJ must assess the Plaintiff's daily activities by presenting a complete and accurate evidentiary record. And if applicable, the ALJ must clearly articulate any inconsistencies between the Plaintiff's daily activities, as fully described in the Plaintiff's testimony at the 2013 hearing and other parts of the record; while providing specific reasons as to why the Plaintiff's daily activities translate into an ability to engage in substantial gainful work.

B.  **Dr. Fink**

Contributing to the necessity for remand is the ALJ's analysis of the opinion of Dr. Fink, who performed a neuropsychological evaluation of the Plaintiff on May 3, 2012, and issued a report detailing his findings. Dr. Fink concluded that the Plaintiff displayed moderate to severe deficits on measures of encoding of new information, executive planning and problem solving, and motor functioning. He noted that the Plaintiff's emotional functioning was significantly distressed, opining that her neurocognitive profile demonstrated significant difficulties in school and work settings, as well as likely neuorological impairments associated with agenesis of the corpus callosum and cortical thinning. In July 2012, Dr. Fink also provided a Medical Source Statement ("MSS"), which contained a GAF assessment of 38. A GAF score between 31–40 reflects "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed adult avoids friends, neglects family, and is unable to work[.] )" *See Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 34 (Text Revision, 4th ed. 2000). He indicated that the Plaintiff had marked

restrictions in activities of daily living; marked difficulties in maintaining social functioning; constant deficiencies of concentration, persistence or pace; and repeated deterioration or decompensation in work or work-like settings.

Contrary to the Plaintiff's contention, Dr. Fink—who only examined the Plaintiff once—does not meet the regulatory definition of a treating source. *See* 20 C.F.R. § 404.1502 (defining a "treating source" as a "physician . . . who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."); *see also White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005) (finding that a physician who only treated the plaintiff once is not a treating physician). Thus, the ALJ was entitled to reject the opinion of Dr. Fink in favor of other physicians' opinions and evidence in the record, particularly if the opinion is not supported by sufficient explanation or evidence. *Haynes v. Barnhart*, 416 F.3d 621, 631 (7th Cir. 2005); *see Diaz v. Chater*, 55 F.3d 300, 306 n. 2 (7th Cir. 1995) ("[I]f conflicting medical evidence is present, the [ALJ] has the responsibility of resolving the conflict."); *Luna v. Shalala*, 22 F.3d 687, 690 (7th Cir. 1994) (concluding that the ALJ appropriately discounted conflicting medical report when it lacked minimal detail and was "cursory in the extreme") (internal quotation marks omitted).

However, in determining that the opinion of Dr. Fink is entitled to "little weight," the ALJ—again—emphasizes the Plaintiff's ability "to care for herself, care for her children, and manage the home," along with her ability "to perform household chores, such as cleaning, cooking and shopping." (R. 28–29.) The ALJ also cites the Plaintiff's ability "to "successfully perform work activity for many months" (R. 29), without providing a complete discussion of the circumstances of such employment. *See, e.g.*, R. 75–76 (testifying that she was terminated as a

laundry worker after only a few months because she had difficulty using her hands and remembering how to operate the laundry machines); (R. 75) (testifying that she was terminated at Arby's because a new manager "wouldn't help" her like the previous manager did). While the ALJ is certainly entitled to reject Dr. Fink's opinion in favor of other physicians' opinions and evidence in the record, he must, nevertheless, afford the Court meaningful review by presenting a complete and accurate evidentiary record on which his decision is based.

Moreover, the Plaintiff argues that Dr. Fink's opinion should be reassessed under sentence six of 42 U.S.C. § 405(g) given the opinion of Dr. Judith DeGrazia Harrington, a psychologist who conducted a neuropsychological evaluation of the Plaintiff in April of 2013—roughly two months after the ALJ rendered his decision—and completed an MSS based upon the evaluation results and four separate office visits with the Plaintiff.[4] *See Schmidt v. Barnhart*, 395 F.3d 737, 742–43 (7th Cir. 2005) ("A reviewing court may order additional evidence to be taken before the Commissioner upon a showing that there exists 'new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'") (quoting sentence six of 42 U.S.C. § 405(g)).

Similar to Dr. Fink, Dr. Harrington concluded that the Plaintiff had marked restrictions in activities of daily living; marked difficulties in maintaining social functioning; constant deficiencies of concentration, persistence or pace; and continual episodes of deterioration. Dr. Harrington specifically noted "extreme loss" in many work-related areas, including understanding and remembering very short, simple instructions and remembering locations and

---

[4]The Court notes that Dr. Harrington's opinion was submitted to the Appeals Council in June 2013.

work-like procedures. (R. 290–91); *see also* R. 283:

> [The Plaintiff] shows problems with motor functioning, spasticity where one hand mirrors the actions of the other, severe problems with attention, retention of information, language, abnormal auditory processing and auditory memory. It is hard for her to learn and extremely difficult for her to remember . . . As shown from her work history, she has been unable to hold even a simple job. She does not process verbally what is said to her. She distorts what has been said to her.

Dr. Harrington diagnosed the Plaintiff with agenesis of the corpus callosum, mood disorder, and as "anti-social aggressive." (R. 289.) She also assigned a GAF score of 40.

Despite the Plaintiff's request, the Court finds it unnecessary to determine whether Dr. Harrington's opinion—which largely supports the restrictions outlined in Dr. Fink's opinion—serves as an independent basis for remand under sentence six of § 405(g). *See Johnson v. Apfel*, 191 F.3d 770, 776 (7th Cir. 1999) (new evidence is only "material" if there is a "reasonable probability" that the ALJ would have reached a different conclusion had the evidence been considered). Given the remandable issues previously identified, economy and efficiency are best served by directing the ALJ to consider Dr. Harrington's opinion as part of a remand under sentence four of § 405(g). *See, e.g.*, *Faucher v. Sec. of Health & Human Servs.*, 17 F.3d 171, 174–75 (6th Cir. 1994) (finding that a district court may order the consideration of new evidence when an ALJ's decision is properly remanded on a separate basis under sentence four of § 405(g)).

Therefore, on remand, the ALJ must assess Dr. Fink's opinion by presenting a complete and accurate evidentiary record. The ALJ must also consider Dr. Fink's opinion in relation to Dr. Harrington's opinion and any other relevant evidence that may or may not support Dr. Fink's conclusions. Once again, the ALJ is entitled to reject Dr. Fink's opinion—or for that matter, Dr. Harrington's—in favor of other medical opinions and

evidence in the record, so long as the ALJ provides a "logical bridge" between the evidence and his conclusions. *Terry*, 580 F.3d at 475.[5]

## C. Handling and Fingering Manipulative Limitations in RFC

Lastly, as noted by the Plaintiff, an RFC must address the non-exertional capacity of a claimant, including any "manipulative [limitations and restrictions] (e.g., reaching, handling)." SSR 96-8p, 1996 WL 374184, at *5–6. Such limitations are of particular relevance here, where the VE opined that, under the hypothetical presented by the ALJ, no jobs are available for an individual who is incapable of engaging in jobs that require occasional bilateral manual dexterity, due to neurological deficits.

Here, both Dr. Fink and Dr. Harrington opined that the Plaintiff suffered from motor impairments. During a test of fine motor manual dexterity with Dr. Fink, the Plaintiff demonstrated low to average performance for her right hand; during a grip-strength test, the Plaintiff reported significant pain in her right hand; and during a test of rapid finger tapping, the Plaintiff demonstrated severe impairment in both hands. Likewise, Dr. Harrington's testing revealed grip strength on the left upper extremities in the below-average range; and simple motor speed was in the severely impaired range on the right and moderately impaired on the left. *See*

---

[5]The Court also notes that, pursuant to SSR 96-6p, an ALJ must obtain an updated medical opinion "[w[hen additional medical evidence is received that in the opinion of the ALJ . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments" under 20 C.F.R. Pt. 404. 1996 WL 374180, at *3–4. In determining that the Plaintiff's mental impairment does not meet or medically equal the criteria of listing 12.04, the ALJ afforded "great weight" to the opinion of State agency consultant, Dr. J. Gange, a non-examining psychologist who reviewed the Plaintiff's record in 2011. Because the opinions of Drs. Fink and Harrington post-dated Dr. Gange's opinion, the ALJ should determine whether an updated medical opinion is necessary under SSR 96-6-p.

*also* Pl.'s Test. 73 (testifying that her agenesis causes the synchronization of her hands); R. 237, Third Party Function Report, Deborah Kimes, Sept. 6, 2011 (same).

Accordingly, in light of the necessity for remand, the ALJ must also consider whether a handling and fingering manipulative limitation is appropriate when determining the Plaintiff's RFC.

## CONCLUSION

For the reasons stated above, the decision of the ALJ is REVERSED and REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings consistent with this Opinion and Order.

SO ORDERED on March 31, 2016.

                                        s/ Theresa L. Springmann
                                        THERESA L. SPRINGMANN
                                        UNITED STATES DISTRICT COURT
                                        FORT WAYNE DIVISION